*M HW*

KC **FILED**

JAN 2 5 2008
*1-25-2008*
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| C.H. ROBINSON WORLDWIDE, INC., a Delaware Corporation, | ) ) ) |
| Plaintiff, | ) ) ) **08CV576** |
| v. | ) **JUDGE ST EVE** |
| JEFFREY R. SIEKMANN, an individual, | ) **MAGISTRATE JUDGE KEYS** |
| Defendant. | ) ) |

**VERIFIED COMPLAINT FOR EMERGENCY INJUNCTIVE AND OTHER RELIEF**

Plaintiff, C.H. ROBINSON WORLDWIDE, INC. ("C.H. Robinson") brings this Verified Complaint against, Defendant, JEFFREY R. SIEKMANN ("Siekmann"), and for its causes of action, states as follows:

**INTRODUCTION**

1. This Verified Complaint and Emergency Motion for Injunctive Relief seeks immediate relief addressing Siekmann's unauthorized accessing of C.H. Robinson's computerized systems and removal of C.H. Robinson's confidential and proprietary customer and business information in an apparent plot to use such information in an unfair and anti-competitive manner.

2. C.H. Robinson is in the business of providing commercial logistics services, including the use of roads, highways, air, ocean and/or the railroad system, to transport or arrange for the transportation of goods in trailers and/or containers on behalf of third parties from a point of origin to their final destination throughout the United States and elsewhere (collectively "Freight Brokerage Services"). C.H. Robinson is one of the industry leaders in Freight Brokerage Services.

3.     In 1999, C.H. Robinson paid well over $100,000,000.00 to acquire substantially all of the assets of a logistics company called American Backhaulers ("Backhaulers"). While there were many facets to the purchase one of the most integral components of the transaction was the exclusive acquisition of a proprietary software program called Express.  Express is a multi-faceted software program that allows C.H. Robinson to operate its business seamlessly across the world by storing confidential information about its business and its customers; serving as the vehicle through which customer orders are placed; tracking order fulfillment; tracking customer and carrier status; identifying available loads, carriers and lanes for shipping; billing customers and tracking employee commissions, to name just a few of the many dynamic features of Express.

4.     Subsequent to acquiring Backhaulers, C.H. Robinson converted its entire business operation to the Express software system.  Consequently, in order to protect its confidential and proprietary software and confidential information contained within Express, all employees, including Siekmann, are required to abide by written agreements and procedures limiting access to Express and its confidential information.

5.     In violation of his agreements and C.H. Robinson's procedures, Siekmann accessed Express; accessed confidential information regarding well over 100 of C.H. Robinson's customers that he does not service; copied the confidential information; downloaded the information to his C.H. Robinson e-mail account; forwarded the information to a personal e-mail account at jsiek@cox.net and then deleted the e-mails from his C.H. Robinson e-mail account by which he removed C.H. Robinson's confidential information to cover his tracks.  C.H. Robinson also discovered that Siekmann recently posted his resume to careerbuilder.com to apparently obtain other employment.

2

6.    Consequently, Siekmann cannot be permitted to use C.H. Robinson's proprietary and confidential secret information, diminish its substantial investment nor violate contractual, statutory and common law obligations.

## PARTIES, JURISDICTION AND VENUE

7.    Plaintiff, C.H. Robinson, is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. C.H. Robinson's Chicago Central office is located in Chicago, Cook County, Illinois. On or about December 16, 1999, C.H. Robinson purchased certain assets of Backhaulers for well over $100,000,000.00 which included, among other things, the Express software program, know-how, restrictive covenants and business information. Prior to C.H. Robinson purchasing Backhaulers, Backhaulers purchased DAV Transportation Services through which Siekmann had originally been employed. C.H. Robinson generates revenues well in excess of the $75,000 jurisdictional requirement and in particular has spent in excess of $75,000 acquiring the confidential information Siekmann removed from C.H. Robinson and generates well in excess of $75,000 from the customers about which Siekmann improperly removed confidential information.

8.    C.H. Robinson is in the business of providing commercial logistics services, including the use of roads, highways, air, ocean and/or the railroad system, to arrange for the transportation of goods in trailers and/or containers on behalf of third parties from a point of origin to their final destination throughout the United States and elsewhere.

9.    Defendant Jeffrey Siekmann is domiciled at and resides at 1731 E. Pontiac Drive Phoenix, Arizona 85024. Siekmann is employed by C.H. Robinson through its Chicago Central office; directly reports to superiors in the Chicago Central Office; routinely travels to the Chicago Central office for training and business meetings and regularly communicates with

3

members of the Chicago Central office through Internet based systems. Siekmann has been a customer representative for many years and is responsible for moving the freight of C.H. Robinsons customers to destinations specified by the customer.

10.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based on a claim arising under the Computer Fraud and Abuse Act, Title 18 U.S.C. § 1030, et seq. and supplementary jurisdiction pursuant to 28 U.S.C. § 1367.    This Court has original jurisdiction of this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000.00, excluding interest and costs. This Court has personal jurisdiction over Siekmann and venue is proper in this District and this Division under 28 U.S.C. § 1391(a), because C.H. Robinson conducts business in this District and because Siekmann is employed here, conduct business here, regularly and purposefully travels here and has breached and threatens to breach duties to C.H. Robinson in this District.

## NATURE OF ACTION

11.    This is an action for violation of the Computer Fraud and Abuse Act, misappropriation of trade secrets, conversion and breach of contract.  C.H. Robinson seeks injunctive relief, compensatory, punitive and statutory damages, as well as attorney's fees and costs.

12.    Siekmann is directly or indirectly violating his Confidentiality Agreement, Data Security Agreement and Internet and E-Mail Use Policy, and applicable law, by acquiring, retaining and/or utilizing without authority C.H. Robinson's confidential and proprietary information.

4

## BACKGROUND

13.     For many years, C.H. Robinson has been a national leader in providing logistics services, and other support services, for the transportation of freight throughout the United States, across state lines in interstate commerce, and elsewhere.  In essence, C.H. Robinson is a travel agent of sorts for freight.  C.H. Robinson has contracts with thousands of independent carriers with whom it contracts to move freight on behalf of its customers.

14.     Through the use of various systems, C.H. Robinson employees provide services by which C.H. Robinson analyzes a customer's business and determines how efficiencies in the shipment of supplies and goods can be achieved.

15.     C.H. Robinson also provides Less Than Truckload ("LTL") services.  Where a customer may have only a pallet of goods to be shipped, C.H. Robinson arranges for the pallet to be consolidated with the pallets of other customers so as to create a full truckload so that one semi-trailer can be used to ship the goods more economically and efficiently.

16.     C.H. Robinson is a leader in customer support and service through the use of a well trained staff, the use of technology and the establishment of strong customer relationships.

17.     C.H. Robinson has invested millions of dollars to create a computerized network throughout the United States, proprietary software and acquire other software to insure that C.H. Robinson can provide excellent logistics planning and service to its customers.  Not only has C.H. Robinson invested in software to support its logistics planning and analysis, but it has also invested in software to permit its customers to electronically transmit and communicate their freight shipping needs to C.H. Robinson.  Additionally,  C.H. Robinson's computerized network allows its employees to communicate and share data through multiple servers, desktop

5

computers and laptop computers throughout the United States as well as utilize the Internet for communication and selling efforts.

18.     C.H. Robinson has also spent extensive time and resources culling customers and developing and analyzing information about customers which have the ability to ship sizable loads on a regular basis. Further, C.H. Robinson has spent considerable resources and time establishing relationships with thousands of carriers willing to accept certain payment terms and operate in the appropriate lanes of transportation or routes. Likewise, C.H. Robinson has spent extensive time and resources identifying the lanes of shipment or routes of carriers most beneficial to C.H. Robinson's customers. Once these pieces of information are identified, it is integrated into C.H. Robinson's proprietary software for easy access through C.H. Robinson's proprietary computer network and integration with other relevant information accessible on a need to know basis by C.H. Robinson employees throughout the United States.

19.     C.H. Robinson has purchased through acquisitions and on its own developed and maintained valuable long-term relationships and substantial goodwill with its customers. C.H. Robinson's business information, long-standing customer relationships and goodwill are of paramount significance to its business reputation and its success.

20.     In order to grow its business and better serve its customers, C.H. Robinson has acquired other freight brokerage businesses throughout the United States such as Backhaulers and has acquired proprietary software at great expense.

21.     Backhaulers was a Chicago based freight brokerage company with sizable office space, numerous employees, proprietary software, a computerized network, goodwill and numerous customer relationships. In or about 1998, Backhaulers acquired DAV Transportation

6

Services ("DAV"). Siekmann was employed by DAV at the time and became a Backhaulers employee.

22.     On or about December 16, 1999, C.H. Robinson acquired all of the assets of Backhaulers by paying well over $100,000,000.00 including, but not limited to, Employee Non-Competition and Confidentiality Agreements, all rights to customized and proprietary software including Express, Backhaulers' know-how, and Backhaulers' intellectual property rights.

23.     While employed by Backhaulers and C.H. Robinson, Siekmann signed numerous agreements and participated in compliance programs designed to protect C.H. Robinson's proprietary and confidential information software and business and customer information.

24.     In exchange for his employment, monies, benefits and access to confidential information, Siekmann signed a Backhaulers' Employee Confidentiality and Non-Compete Agreement on or about March 25, 1998 in which he agreed that he would keep secret and confidential, and not use, disclose copy or assist any other person or firm in the use, disclosure or copying of C.H. Robinson's Confidential Information. Siekmann also agreed to return to C.H. Robinson all tangible records and documents relating to C.H. Robinson upon his termination or upon the request of C.H. Robinson. A copy of the Backhaulers' Agreement is attached hereto and incorporated herein at Exhibit A.

25.     In exchange for his employment, monies, benefits and access to confidential information, Siekmann signed a C.H. Robinson Data Security Agreement on or about December 4, 1999 in which he agreed that any information such as customer lists, customer names, customer records, sales figures, and reports are confidential and shall not be retained or stored in any manner outside C.H. Robinson, including personal computers or elsewhere. A copy of the Data Security Agreement is attached hereto and incorporated herein at Exhibit B.

7

26.     In exchange for his employment, monies, benefits and access to confidential information, Siekmann signed a C.H. Robinson Internet and E-Mail Use Policy on or about December 4, 1999 in which he agreed that he would not use C.H. Robinson's e-mail/Internet for personal gain or in violation of C.H. Robinson's policies or applicable laws. A copy of the Internet and E-Mail Use Policy is attached hereto and incorporated herein at Exhibit C.

27.     In exchange for his employment, monies, benefits and access to confidential information, Siekmann signed a C.H. Robinson Employee Agreement on or about February 28, 2005 in which he agreed that he will never at any time use, disclose, copy or assist any other person or firm in the use, disclosure or copying of any C.H. Robinsons confidential information. Further, Siekmann agreed that he is prohibited for two years following employment termination from directly or indirectly soliciting, selling or rendering services to any customer or prospective customer with which he worked or account for which he acquired confidential information during the two years prior to his termination from C.H. Robinson.  A copy of the February 2005 Employee Agreement is attached hereto and incorporated herein at Exhibit D.

28.     In exchange for his employment, monies, benefits and access to confidential information, Siekmann signed a C.H. Robinson Employee Agreement on or about December 12, 2005 in which he agreed that he will never at any time use, disclose, copy or assist any other person or firm in the use, disclosure or copying of any C.H. Robinsons confidential information. Further, Siekmann agreed that he is prohibited for two years following employment termination from directly or indirectly soliciting, selling or rendering services to any customer or prospective customer with which he worked or account for which he acquired confidential information during the two years prior to his termination from C.H. Robinson.  A copy of the December 2005 Employee Agreement is attached hereto and incorporated herein at Exhibit E.

8

29.     C.H. Robinson also requires its employees to complete compliance training and execute a hard copy or electronic certificate acknowledging compliance with C.H. Robinson's policies and Code of Ethics.  Siekmann completed this program several times, including but not limited to, in 2006 and 2007.

## EXPRESS SOFTWARE

30.     A significant portion of C.H. Robinson's decision to acquire Backhaulers and to pay millions of dollars for it was to obtain Backhaulers' Express software.

31.     Express was developed over many years at a cost of millions of dollars by a team of programmers.  Likewise, upon C.H. Robinson's purchase of Express, C.H. Robinson refined and further developed Express into the tremendously valuable tool that it is today.

32.     Express is a proprietary software tool that literally puts the day-to-day operations, management, accounting, sales, performance and communication functions for C.H. Robinson on the desktops of each C.H. Robinson employee, in one form or another, across the country. The software is so advanced and so industry specific that it has the capability to grow as C.H. Robinson's business grows, monitor and calculate revenue splits, integrate several business units, manage thousands of freight deliveries and carriers simultaneously, automatically monitor customer relationships and orders, look for more efficient and economical ways to deliver freight and match carriers with freight, track sales calls, queries, driver contacts, customer contacts, mapping and claims management, to name a few of the features.

33.     Hundreds of pieces of information can be viewed simultaneously or called up using specific keystrokes and shortcuts specific to Express.  Further, Express has communication tools built-in which allow C.H. Robinson employees to communicate quickly and efficiently with anyone in the organization in the United States and elsewhere.

9

34.    The functionality of Express, including, but not limited to its unique matching feature, access to information, multiple use of information, automated functions, tracking features, keystrokes and shortcuts are unique to Express and are the result of years of development. These proprietary combinations of features and functions are carried out through the use of proprietary source code and object code which are unique to C.H. Robinson and developed over many years.

35.    A similar product could not be reproduced without years of development and/or access to C.H. Robinson's proprietary information, source code, object code, know-how and industry testing and experience.

36.    The Express software, source code and object code reside on C.H. Robinson's computer network. The network and its content are password protected as well as being the subject of confidentiality training and express security agreements.

## EVENTS GIVING RISE TO THIS ACTION

37.    C.H. Robinson has invested substantial time and money gathering and developing confidential and proprietary information concerning its customers. This confidential and proprietary information includes, but is not limited to, customer contact information, sales information, credit information and detailed information about current customer requirements, preferences and purchase histories.

38.    C.H. Robinson requires that its confidential and proprietary information be kept strictly confidential by its employees and restricts access to this information. C.H. Robinson uses secure, password-protected databases to organize, maintain, secure, and access its confidential and propriety information.

10

39.     C.H. Robinson utilizes numerous methods to protect its information, including the policies and agreements previously identified in this Complaint.   In support of these agreements and policies, C.H. Robinson monitors employee e-mails, instant messages, and Internet usage. C.H. Robinson currently uses Symantec Compliance Accelerator software to monitor e-mails sent by employees.  This software scans all sent e-mails and attachments for certain words and phrases.  Members of C.H. Robinson's Employee Relations group then review those e-mails and attachments to determine if any policy violations have occurred.  C.H. Robinson also uses Veritas Enterprise Vault software to capture and store all e-mails received and sent through the company's computer systems.  E-mails captured by this software cannot be deleted by an employee.

40.     On January 15, 2008, C.H. Robinson Employee Relations personnel were reviewing e-mails from the Chicago Central office that had been captured by the Compliance Accelerator software.  In doing so, it was discovered that 14 e-mails had been sent from Siekmann's C.H. Robinson email account to an outside email account identified as jsiek@cox.net.  The content of the e-mails appeared suspicious because they were "screen shots" of entries in C.H. Robinson's Express database, where C.H. Robinson maintains confidential and proprietary customer and business information.  The screen shots that Siekmann emailed outside the company contained highly confidential customer information including customer contacts, credit worthiness, recent business dealings, last quote date, D & B number, remaining credit and more.

41.     The Veritas software was then employed on a few occasions to review all of Siekmann's e-mails sent from his C.H. Robinson account to the outside email account for the period from January 1, 2008 to January 23, 2008.  The review indicated that Siekmann had sent

11

over 127 e-mails from his C.H. Robinson account to his outside account during that time period, including the 14 e-mails discovered during the initial review using the Compliance Accelerator software. Over 125 e-mails contained screen shots of the Express database, five contained Express screen shots that included a list of customer information, three contained Excel spreadsheets, one contained Microsoft Word documents that included extremely detailed customer information and one contained a PowerPoint client presentation. The review also revealed that the customers for which screen shots were taken by Siekmann were not customers that Siekmann services at C.H. Robinson. Instead, the customers are serviced by other C.H. Robinson employees.

42.    Notably, the review also revealed that that Siekmann apparently attempted to hide his tracks by deleting the e-mails that he sent from his C.H. Robinson e-mail account from his "Outbox".

43.    C.H. Robinson never authorized Siekmann to email or otherwise forward C.H. Robinson's confidential and proprietary information to an external email account, it did not authorize Siekmann to view or remove data regarding customers that Siekmann did not service and it did not authorize Siekmann to destroy or delete electronic e-mail. In fact, there would be no legitimate reason for Siekmann to view confidential data regarding customers that he did not service.

44.    Upon becoming employed by C.H. Robinson, Siekmann was entrusted with proprietary business and software information. This information included, among other things: margin information, pricing, the identity of vendors, vendor pricing and relationship information, rate structures, marketing strategies, the identity of customers, customer transportation analysis information, software methodology information, customer contact information, container fleet

information, detailed information about current customer requirements and preferences and purchase histories, source code, object code, software functionality and other information.

45.    C.H. Robinson's proprietary information is not generally known in the industry and is valuable because C.H. Robinson derives economic value from the information not being publicly available.

46.    C.H. Robinson's proprietary business, software and customer information is of great value to C.H. Robinson and such information would give any competitor who improperly acquired such information an unfair competitive advantage.

47.    C.H. Robinson protects its proprietary business and customer information by requiring employees to keep business, software and customer information confidential, by password protecting computers, by limiting access to information, by requiring employees to sign data security agreements, by requiring employees to sign a certificate of compliance and by requiring employees to review its Code of Ethics.

48.    C.H. Robinson's  customer relationships and goodwill are of paramount importance to C.H. Robinson in that many of C.H. Robinson's customers have been customers of C.H. Robinson for quite some time and hence, are long-term or near permanent customers. Moreover, in a number of instances, C.H. Robinson's customers entrust C.H. Robinson with confidential information.

49.    While employed by C.H. Robinson, Siekmann has day-to-day contact with customers, vendors, and proprietary information. He is privy to the pricing structure, margins, methodologies, fees, vendor identities, customer identities, software, coding and strategies being

13

utilized by C.H. Robinson and which would give a competitor an unfair advantage in a competing business.

50.    It was also discovered that Siekmann recently posted his resume to the careerbuilder.com website in an apparent attempt to obtain employment with a competitor to further benefit from the confidential information removed from C.H. Robinson. A copy of the careerbuilder.com posting is attached hereto and incorporated herein at Exhibit F.

51.    Siekmann's actions are a serious threat to C.H. Robinson's business, are in violation of contractual obligations and applicable law and unjustly enrich Siekmann. C.H. Robinson does not have an adequate remedy at law.

**COUNT I**

**BREACH OF CONTRACT**

52.    C.H. Robinson hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 51.

53.    Siekmann's Employee, Confidentiality, Data and Internet/E-Mail Agreements, are valid and enforceable contracts. The post employment covenants, confidentiality covenants and other provisions contained in the Agreements are reasonable in scope and duration and are reasonably necessary to protect legitimate protectable interests in the goodwill, long-term customer relationships and proprietary business and customer information.

54.    C.H. Robinson has fully performed all of its obligations under the Agreements. Exhibits A through E.

CHI 11400625.1

55.    Siekmann is breaching his Agreements including without limitation his employment agreements, data security agreements, confidentiality agreements and code of ethics in at least one of the following ways by:

>    A.    removing from, retaining or failing to return C.H. Robinson's confidential information; or
>
>    B.    utilizing or disclosing confidential information of C.H. Robinson;

56.    C.H. Robinson has been damaged as a result of Siekmann's actions.

## COUNT II

### ACTUAL AND THREATENED MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION

57.    C.H. Robinson hereby repeats and realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 51.

58.    The proprietary business and customer information of C.H. Robinson constitute trade secrets because C.H. Robinson derives independent economic value from that information, such information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

59.    Siekmann misappropriated and/or threatens to inevitably misappropriate C.H. Robinson's trade secrets without C.H. Robinson's consent in violation of Illinois Trade Secrets Act. 765 ILCS 1065 *et seq.*

60.    On information and belief, Siekmann will or has become employed by or affiliated with a competitor of C.H. Robinson and has unlawfully removed C.H. Robinson's

trade secrets to benefit himself and/or a competitor and thus, will inevitably utilize or disclose C.H. Robinson's trade secrets and/or confidential information.

61.    Siekmann has been or will be unjustly enriched by the misappropriation of C.H. Robinson's trade secrets and/or confidential information, and will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate C.H. Robinson's trade secrets and confidential information.

62.    Siekmann's misappropriation has been willful and malicious.

63.    As a result of the misappropriation of C.H. Robinson's trade secrets, C.H. Robinson faces irreparable injury, has been injured and/or Siekmann has been unjustly enriched.

## COUNT III

## CONVERSION

64.    C.H. Robinson repeats and realleges the allegations contained in paragraphs 1-51 above as if fully set forth herein.

65.    Siekmann removed from C.H. Robinson or retained its property without authorization, and converted it to his own use.

66.    C.H. Robinson has demanded from Siekmann the return of its property through its Code of Ethics, training and Agreements.

67.    Siekmann has failed to return to C.H. Robinson its property.

68.    As a direct and proximate result of Siekmann's actions C.H. Robinson has been damaged.

CH1 11400625.1

69.    C.H. Robinson has suffered damages as a result of Siekmann's actions in an amount to be determined at trial.   Because Siekmann's actions have been willful, malicious, outrageous, oppressive or done in complete disregard of the consequences they might have upon C.H. Robinson, the award of exemplary and punitive damages in an amount to be proven at trial are proper.

**COUNT IV**

**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**
**18 U.S.C. § 1030 ET SEQ.**

70.    C.H. Robinson incorporates by reference the allegations which are contained in paragraphs 1 through 51.

71.    C.H. Robinson's computer system is a protected computer and network which is used across state lines in interstate commerce, has Internet access across state lines and is used to transfer C.H. Robinson information for sales in interstate commerce.

72.    Siekmann was not authorized by C.H. Robinson to access its computer systems, access its computerized information, copy electronic information files, destroy electronic information files, send electronic information files to his personal e-mail account or continue to possess C.H. Robinson electronic files and data for personal gain or that of a competitor.

73.    Siekmann:

    A.    intentionally accessed a computer system without authorization or exceeded his authority to obtain information from a protected computer causing damage in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(2)(C);

    B.    knowingly and with intent to defraud, accessed a protected computer without authorization or exceeded his authority, and by means of such conduct furthered the intended fraud and obtained valuable information

17

resulting in damages exceeding $5000.00 in violation of 18 U.S.C. § 1030(a)(4); or

C.    intentionally accessed a protected computer without authorization or exceeded his authority, and, as a result of such conduct, caused damage in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(5)(A)(iii).

74.    C.H. Robinson faces irreparable injury and has suffered damages as a result of Siekmann's actions in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, C.H. Robinson prays for the following relief:

A.    That Siekmann be enjoined and ordered:

1.    That Siekmann, his officers, agents, servants, employees, attorneys and all parties in active concert or participation with him, are enjoined from using or disclosing any confidential or proprietary information that Siekmann obtained from C.H. Robinson;

2.    That Siekmann, his officers, agents, servants, employees, attorneys and all parties in active concert or participation with him, are enjoined and ordered to account for and return to C.H. Robinson all originals and all copies of files, data, and information removed from C.H. Robinson, including, but not limited to, the confidential and proprietary customer information, that Siekmann obtained from C.H. Robinson;

3.    That Siekmann, his officers, agents, servants, employees, attorneys and all parties in active concert or participation with him, are hereby ordered to preserve all discs and electronic storage devices in their custody, possession and control to which Siekmann had access, and to turn over to a third-party investigator representative of C.H. Robinson all electronic storage media in their custody, possession or control, including, but not limited to, discs and hard drives accessible to Siekmann on which C.H. Robinson's information may reside and that C.H. Robinson be permitted to image and analyze said media and devices to recover and account for C.H. Robinson's confidential information;

4.    That Siekmann is ordered to provide access for inspection to the outside email account jsiek@cox.net to which he emailed C.H. Robinson information from his C.H. Robinson email account and any other e-mail account in his custody or control;

5.    That Siekmann is enjoined from contacting or conducting business with any C.H. Robinson customer whose information he improperly accessed and/or misappropriated; and

CH1 11400625.1

6.    That Siekmann is enjoined from contacting or conducting business with any C.H. Robinson customer with whom he conducted business on behalf of C.H. Robinson within the twenty-four (24) months preceding issuance of this Order.

B.    That C.H. Robinson be awarded compensatory damages it has suffered, in an amount to be proven at trial and in excess of $75,000;

C.    That C.H. Robinson be awarded punitive and/or exemplary damages for willful and malicious conduct;

D.    That C.H. Robinson be awarded attorney's fees and the costs of this action as permitted by law; and

E.    That C.H. Robinson be awarded such other and further relief as the Court deems equitable and just.

Respectfully submitted,

C.H. ROBINSON WORLDWIDE, INC.

By:_____
One of Its Attorneys

Michael D. Wexler
Janet V. Siegel
SEYFARTH SHAW LLP
131 S. Dearborn Street
Suite 2400
Chicago, Illinois 60603
(312) 460-5000
Attorneys for Plaintiff

CH1 11400625.1

## VERIFICATION

Edward Leshin, pursuant to 28 U.S.C. § 1746, states as follows:

1.       I am a Managing Director of the Chicago Central Branch office of C.H. Robinson Worldwide, Inc. I have or have been provided with full knowledge of and am competent to testify to all matters stated herein.

2.       I have read C.H. Robinson's Verified Complaint for Emergency Injunctive and Other Relief and the factual allegations contained therein are true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of January, 2008.

Edward Leshin

20

CASE NO. _08 cv 576_____

ATTACHMENT NO._____

EXHIBIT  _A_____

TAB (DESCRIPTION) _____



13167



### AMERICAN BACKHAULERS, INC.
### EMPLOYEE CONFIDENTIALITY AND NON-COMPETE AGREEMENT

#### Recitals

I, __Jeff Siekmann__ , the undersigned employee of American Backhaulers Inc., ("Company"), hereby acknowledge and agree that Company is engaged in, among other things, the business of developing, marketing and selling freight transportation services, and that Company has invested substantial resources in order to develop and maintain its confidential and proprietary information about [shippers, carriers, trucking equipment, customers, purchasing agents, rates, lanes, internal information systems] which are of unique value in the conduct and growth of the Company's business (as further defined below, "Confidential Information"). I acknowledge and agree that such Confidential Information has enabled the Company to conduct its business with unusual success and thus afforded unusual employment opportunities and potential to its employees.

In connection with my employment with Company, Company has given and will give me access to its Confidential Information which if used or disclosed to Company's competitors could be very harmful to Company's business and could cause Company to lose its competitive edge in the marketplace. I further acknowledge that in the course of performing my employment obligations to Company, I will be a representative of Company to many of Company's customers and, in some instances, the Company's primary contact with the customer, carrier, or vendor and as such will be significantly responsible for maintaining or enhancing the Company's business, goodwill and/or relationships with such entities.

I desire to continue to be employed by Company to provide [sales, operational, managerial, and/or administrative] services to Company; to be eligible for opportunities for [advancement within Company and /or] compensation increases which otherwise would not be available to me; and to be given access to Confidential Information of Company necessary for me to perform my job, but which Company would not make available to me but for my signing and agreeing to abide by the terms of this Agreement.

I recognize and acknowledge that if I were to leave Company, Company would need certain protections in order to ensure that I do not misappropriate or misuse any Confidential Information or goodwill.

In consideration of my continued employment, I agree as follows:

1.      **Employment Services.** During my employment with Company, I will faithfully render such services as may be delegated to me by Company, and will devote my entire business time, best efforts, abilities, skills and full attention to the Company's business.

American Backhaulers

2.    <u>Confidential Information; Company Property</u>

(a)    Both during and after my employment with Company, I will keep secret and confidential, and not use, disclose, copy or assist any other person or firm in the use, disclosure or copying of, except as directly required for me to perform my responsibilities for Company, any of Company's Confidential Information.

(b)    For purposes of this Agreement, I understand that "Confidential Information" includes any information pertaining to Company's business which is generally known in the freight transportation industry, including without limitation (i) trade secrets, (ii) brokerage and commission rates, (iii) marketing, accounting, merchandising, and information-gathering techniques and methods, and (iv) accumulated data, listings, or similar recorded matter used or useful in freight transportation operations including but not limited to carrier, customer, and shipper information, shipment, rates, lanes, quotes, service information, lists, reports, and/or details pertaining to commissions, movements, and payments, and equipment availability. Internal processes, software and computer programs and derivative works, and all discoveries, concepts, ideas and inventions, whether patentable or protectable by copyright, including without limitation the nature and results of research and development activities, products development and design information, technical information or product or program performance and reliability, production processes, formulas, "know-how", designs, drawings and specifications, presentations, programs, computer software, source codes, and object codes, and information related to thereto, systems, systems management techniques and other techniques, procedures, policies, or creations conceived, made or developed in whole or part, by the Employer or its employees, agents or representatives or by the Employee at any time during the Employee's employment. Business and marketing plans, projections, sales data and reports, confidential evaluations, compilations and/or analyses of technical or business information, profit margins, customer requirements, costs, pricing, profitability, sales and marketing strategies, pricing policies, strategic plans, operating and financial data and projections, names and addresses of existing and potential customers, carriers, and vendors, sources of supplies, supply lists, employee lists, mailing lists, and information concerning relations between Company and its employees, customers, carriers and any others in possession directly or indirectly of Company.

(c)    All tangible records and documents relating to Company, regardless of the type of medium in which they are preserved (whether on paper, in an electronically accessible or computer format), are the sole and exclusive property of Company and shall be returned to Company at Company's request and, in any event, upon my termination of employment.

3.    <u>Inventions.</u> Any and all ideas, inventions, discoveries, patents, patent applications, continuation-in-part patent applications, technology, copyrights, derivative works, trademarks, service marks, improvements, trade secrets and the like, which are developed, conceived, created, discovered, learned, produced and/or otherwise generated by me, whether individually or otherwise, during the time that I am employed by Company, whether or not during working hours, that relate to (i) current and anticipated businesses and/or activities of Company, (ii) Company's current and anticipated research or development, or (iii) any work performed by me for Company, shall be the sole and exclusive property of Company, and Company shall own any and all right, title and interest in and to any such ideas, inventions, discoveries, patents, patent applications, technology, copyrights, derivative works, trademarks, service marks,

American Backhaulers

improvements, trade secrets and the like, whenever requested to do so by Company, at Company's expense, and I agree to execute any and all applications, assignments or other instruments which Company deems desirable or necessary to protect such interests.

The prior paragraph shall not apply to any invention for which no equipment, supplies, facilities, or Confidential Information of Company was used and which was developed entirely on my own time, unless (i) the invention related to Company's business or to Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by me for Company.

4.    Post-Termination Restrictions.

(a)    I agree that during my employment with the Company and for a period of two years following my termination of employment, regardless of whether my termination is voluntary or involuntary or with or without cause, I will not, directly or indirectly, alone or in conjunction with others: 

(i)    solicit, sell or render services to or for the benefit of any competing business with any customer or prospective customer of Company (x) with whom I worked or had regular contact, (y) on whose account I worked, and/or (z) about whom I had any Confidential Information at any time during the last two years of my employment with the Company; or

(ii)    Cause or attempt to cause any such customer or potential customer of the Company to divert, terminate, limit or in any manner modify or fail to enter into any actual or potential business relationship with Company; or

(iii)    hire any other employee from Company, or solicit or seek to influence any other employee to leave Company's service.

(b)    For purposes of this Agreement, I understand that "customer: means any person, business, firm, undertaking, company or organization engaged in the transportation industry as a shipper, receiver or carrier. I understand that "competing business" means any person, business, firm, undertaking, company or organization, other than Company, which is  (i) is engaged in, or is about to become engaged in, the transportation industry [the freight brokerage business], (ii) regardless of the nature of its business, competes either directly or indirectly with Company in contracting, arranging, providing, procuring, furnishing or soliciting transportation services, or (iii) has employed or potentially could employ Company's services in freight brokerage matters.

American Backhaulers

    **5.**    <u>Reasonableness of Restrictions; Remedies.</u>  I acknowledge and agree that the restrictions contained in this Agreement are reasonable and enforceable because of Company's legitimate interests in protecting its goodwill and Confidential Information and my background is such that the restraints should not impose any undue hardship on me. In the event of a breach or threatened breach of any of my duties and obligations under this Agreement, I agree that the company shall be entitled to a temporary restraining order and a preliminary and permanent injunction to prevent such breach or threatened breach. I acknowledge that Company's entitlement to injunctive relief shall be in addition to any other right or remedies the Company may have, legal or equitable, including without limitation the right to withhold any payments due to me under any Company-sponsored employee benefit plan. I specifically agree that, if there is a question as to the enforceability of any of the provisions of this Agreement, I will not engage in any conduct inconsistent with or contrary to such Agreement until after the question has been resolved by a final judgment of a court of competent jurisdiction.

    **6.**    <u>Miscellaneous</u>.

    I understand that I am an employee-at-will and that my employment with Company may be terminated by either Company or me, with or without cause, at any time and with or without prior notice. I also understand and agree that my title and duties may be reduced or expanded, with or without notice and without any corresponding change in compensation. I agree that the at-will relationship may be varied only by a written agreement, specifically so stating, executed by an officer of the Company, and that no policy statement, employee handbook or personnel practice to the contrary can negate the employment at-will relationship specified herein.

    To ensure a clear understanding of the Agreement, I agree, at the time of any termination of my employment, to engage in an exit interview with Company at a time and place designated by the Company and at the Company's expense. I understand and agree that during said exit interview, I may be required to confirm that I will comply with my obligations under this agreement.

    This agreement contains the complete understanding between the Company and me pertaining to the subject matter of the Agreement. Any amendments hereto must be in writing and signed by the parties. This Agreement shall be freely assignable by Company to and shall inure to the benefit of, and be binding upon, any other entity which shall succeed to Company's business. Being a contract for personal services, neither this Agreement nor any rights hereunder shall be assigned by me.

    I agree that Company's failure to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of such provisions or to affect either the validity of this Agreement or the right of Company thereafter to enforce each and every provision in accordance with the terms of this Agreement.

    If any provision of this agreement is determined by a court of competent jurisdiction to be unenforceable because it is overbroad, the other provisions hereof shall not be effected, and this agreement shall be modified to the extent necessary to make the invalid or unenforceable provision valid and enforceable to the maximum extent permissible under applicable law. This Agreement shall be construed in accordance with the laws of the State of

American Backhaulers

Illinois, and I hereby consent to the filing and conduct of any litigation concerning this Agreement exclusively in the State of Illinois.

I understand that this Agreement, among other things, places restrictions on my ability to engage in employment activities competitive with Company's business. By signing this Agreement, I acknowledge that I have had ample time to reflect on these restrictions and am willing to abide fully with the terms of this Agreement.

_____          _____
              Employee                            3/25/98
                                                    Date

This Agreement shall become effective upon acceptance by Company.
Accepted for American Backhaulers, Inc.:

AMERICAN BACKHAULERS, INC.

By: _____

Title: _____

Date: _____

ABH/nonco——————(1998

CASE NO. _08 cv 576_____

ATTACHMENT NO._____

EXHIBIT ___β_____

TAB (DESCRIPTION) _____

13167

(1)

# DATA SECURITY AGREEMENT

I agree that for and during the entire term of my employment, any information such as data, figures, sales figures, customer lists, customer names, tax records, computer programs, personnel history, accounting procedures, financial records, customer records, management or branch reports, whether generated by me or not, and the like shall be considered as private, confidential and privileged records of C.H. Robinson Company and its subsidiaries, divisions and affiliated companies (hereinafter "Robinson"). I agree that I will not retain or store in any manner any of the private, confidential and privileged records of Robinson outside the office. I understand that this prohibition includes, but is not limited to the storage of Robinson's confidential and proprietary records on personal computers in my home or elsewhere.

I agree that any confidential and proprietary information, including any copies, currently in my possession outside the office will be delivered to Robinson immediately without making or retaining copies or excerpts. I understand that no disciplinary action will be taken for my prompt return of this information.

I understand however, that the failure to comply with this Agreement may subject me to discipline and possible termination for future violations.


Dated: _12/4/1999_____      By: _____
                                    (Employee)

CASE NO.    _08cv 576_____

ATTACHMENT NO._____

EXHIBIT    _C_____

TAB (DESCRIPTION) _____

## Internet and E-Mail Use Policy

13167

(V)

C.H. Robinson Company has adopted the Internet as a valuable tool for employee communications. Every employee has the responsibility to use these services in a professional and productive manner.

### Acceptable Uses of E-mail and the Internet
E-Mail and Internet access has been provided for business purposes. Employees accessing these services are representing the Company, and must only use these tools in an ethical and lawful manner. Incidental and occasional personal use of these resources may be permitted, so long as personal use occurs outside of regular working hours and does not conflict with the primary business purpose for which they have been provided or with the Company's policies or applicable laws and regulations.

### Unacceptable Use of the Internet
The Company's systems may not be used to create, view, transmit or download material that is derogatory, defamatory, sexually explicit or offensive, such as slurs, pictures, cartoons, epithets or anything that may be construed as harassment or discrimination based on race, color, national origin, sex, sexual orientation, age, disability, or religious or political beliefs.

The Company e-mail/Internet connection must not be used for personal gain, advancement of individual views, solicitation of non-company business, or any illegal use. Unauthorized and illegal uses would include gambling, violating copyright, trademark or other material protection laws, or copying of software in a manner inconsistent with vendor's license agreements.

Internet access consumes resources of the Company's computer network, including cabling and server processing. Employees should avoid connecting to Internet sites which transmit a large volume of information, as excessive traffic can result in the loss of network efficiency for all employees. Also, mass e-mails, chain messages, and e-mails with attached graphics impede the system and should remain minimal and business-related only.

Every time an employee accesses any site on the Internet or sends an e-mail, the employee's e-mail address and the Company are identified. Using any computer system to discredit the Company in any way or to compromise Company confidential, technical, or proprietary information, is prohibited.

### No expectation of privacy
All electronic communications in the Company's computer and communication systems are the property of the Company. All messages created, sent, or retrieved should be considered public information and will be monitored for business purposes without prior notice, to protect confidential information, prevent abuse of the system, and to monitor workflow and productivity. **Do not expect that the messages you send or receive are private or confidential.** The Company's MIS Department routinely monitors both e-mail and Internet usage, including file attachments and sites visited or attempted to visit.

### Records Retention
Because e-mails can be forwarded, copied, altered, and distributed beyond the original author's control, and are backed up in multiple locations, **e-mail messages should be considered a permanent, rather than temporary, form of communication and are subject to seizure in an investigation.** Please refer to the companies legal/compliance policies for how long items should be kept. Regularly discard and delete old e-mails unless they pertain to an ongoing dispute or a policy requires that they be kept.

### Remote Access Users
The Company provides remote employee access to resources on the internal corporate network on an as-needed basis. Authorized users may only gain access to the Company network through the Company's remote authentication process, in addition to the normal user ID and password. Any additional remote access mechanisms are prohibited.

### Violations
These guidelines are intended to provide employees with general examples of acceptable and unacceptable uses of C.H. Robinson Company's Internet and e-mail connections. A violation of this policy may result in disciplinary action up to and including termination.

I have read the above, understand it and agree to comply with its terms.

_____                          12/4/1999
Please Print Name                                        Date

Jeffrey R. Siekmann

6/99

CASE NO.    08cv 5 76 _____

ATTACHMENT NO. _____

EXHIBIT    D _____

TAB (DESCRIPTION) _____

FEB-27-2005  09:51                                                                          P.01

# C. H. ROBINSON WORLDWIDE, INC. AND SUBSIDIARIES
# EMPLOYEE AGREEMENT

JEFFREY R. SIEKMANN _____, hereinafter called "employee", "I", and

"me".

**PRINT NAME**

### I.
### RECITALS

Employee wishes to be employed by C.H. Robinson Worldwide, Inc., or one of its Subsidiary or affiliated companies ("the Company") in a significant position involving customer or vendor contact, and access to the Company's confidential and proprietary business information. Employee wishes to enter into and continue such employment with the potential of increased responsibility and knowledge about the Company's affairs.

### II.
### DEFINITIONS

In this Agreement:

A.   The "Company" means C.H Robinson Worldwide, Inc., and all existing or future affiliated corporations including all subsidiaries, divisions and enterprises owned or controlled by these corporations.

B.   "The Company Businesses" shall mean the fresh food or food ingredient sales business (similar to the Company's food distribution), or the freight contracting, contract logistics, freight forwarding, transportation logistics, transportation-related information systems businesses or custom house brokerage businesses, and other businesses the Company may become involved in now or in the future (collectively referred to as the "Company Businesses").

C.   "Confidential Information" shall mean,

   1.   All information, written (or generated/stored on magnetic, digital, photographic or other media) or oral, not generally known, or proprietary to the Company about the Company's designs, customers, supplies, and the Company's marketing, accounting, merchandising and information- gathering techniques and methods, and all accumulated data, listings, or similar recorded matter used or useful in the Company Businesses, which information includes but is not limited to the Company's customer and carrier lists, business forms, systems, practices, weekly loading lists, service contracts, pricing information, computer programs and marketing aids.

   2.   All information disclosed to me, or to which I have access during the period of my employment, for which there is any reasonable basis to be believed is, or which appears to be treated by the Company as, Confidential Information, shall be presumed to be Confidential Information hereunder.

D.   "Competing Business" means any business, firm, undertaking, company or organization, other than the Company, which:

   1.   is engaged in, or is about to become engaged in a business or businesses similar to the Company Businesses, or

   2.   regardless of the nature of its business, either competes directly or indirectly with the Company in any of the Company Businesses, or

   3.   any person, company or organization engaged in the produce or transportation industries as a shipper, receiver or carrier.

E.   "Customer" means any person, company or organization that has employed or potentially could employ the Company's services in any of the Company Businesses.

### III.
### NATURE OF EMPLOYEE'S ACTIVITIES

A.   I am aware and acknowledge that the Company has developed a special competence in the Company Businesses, and has accumulated as proprietary information (not generally known to others) more and better information about shippers, carriers, truckers, trucking equipment, railroads, ocean carriers, foreign agents, customers, purchasing agents and similar matters which are of unique value in the conduct and growth of the Company's Businesses. This proprietary pool of information has enabled the Company to conduct the Company Businesses with unusual success and has thus afforded unusual job opportunities and potential to its employees.

B.   In the course of my employment, I wish to be employed in a position or positions with the Company in which I may receive or contribute to Confidential Information. It is my desire to continue progressing in the Company in both sales, operations, management and customer-related capacities, and I recognize that optimum progression and specialization cannot take place unless Confidential Information relating to technology, processes, plans, development, activity, customers and the like is entrusted to me.

C.   The Company promises to provide me with Confidential Information to permit me to carry out, perform, and fulfill my job responsibilities. I acknowledge that the Company promises to provide me with such Confidential Information, and I further acknowledge in the course of carrying out, performing and fulfilling my responsibilities for the Company, I have been given Confidential Information relating to the Company's Businesses and customers, and I recognize that disclosure of any such Confidential Information to competitors of the Company or to the general public would be highly detrimental to the Company. I further acknowledge that, in the course of performing my obligations to the Company, I will be a representative of the Company to many of the Company's customers and, in some instances, practically the Company's sole and exclusive contact with the customer. In this capacity, I will be significantly responsible for maintaining or enhancing the business

relationship and/or goodwill of the Company with such customers.

## IV.
## PROTECTION OF BUSINESS

Therefore, in consideration of the Company's promise to provide me with Confidential Information, in consideration of my employment by the Company and in consideration of the compensation to be paid to me from time to time during such employment,

I hereby agree as follows:

A.    Except as may be required in the performance of my employment duties with the Company, I will never at any time use, disclose, copy or assist any other person or firm in the use, disclosure or copying of any Confidential Information.

B.    Upon the termination of my employment with the Company, all records or copies of such Confidential Information in my possession, whether prepared by me or others, and regardless of how the same came into my possession, will be turned over to the Company by me.

C.    For a period of two (2) years after the termination of my employment with the Company, however occasioned and for whatever reason, I will not:

    1.    Directly or indirectly solicit, sell or render services to or for the benefit of any Competing Business, including a business which I may own in whole or in part, with any customer or prospective customer of the Company with whom I worked or had regular contact, or on whose account I worked, at any time during the last two years of my employment with the Company; or

    2.    Recruit, hire or solicit any employee of the Company for employment with or on behalf of any Competing Business or attempt to interfere with the employment contracts or contract relationships between the Company and its employees, or directly or indirectly cause or attempt to cause any employee of the Company to terminate employment with the Company.

    3.    Cause or attempt to cause any customer of the Company to divert, terminate, limit or in any manner modify or fail to enter into any actual or potential business relationship with the Company.

    4.    It is understood by me and agreed to by the Company that upon the termination of my employment hereunder, I will not be restricted temporarily from competing with the Company so long as I comply with the provisions of Part IV herein.

    5.    It is further understood and agreed that the running of the two (2) year period of restriction set forth in Part IV C shall be tolled during any time period in which I violate the provisions of Part IV C.

D.    I will devote my entire time, attention and energies to the business of the Company and shall not, during the period of my employment, be engaged in any other business activity whether or not such business is pursued for gain, profit or other pecuniary advantage. This restriction, however, shall not be construed as preventing me from investing my assets in such form or manner as will not require any services on my part in the day-to-day operation of the affairs of the companies in which such investments are made.

## V.
## POST-EMPLOYMENT COMPENSATION

A.    Except as provided in paragraphs C and D of this Part V, if, following the termination of my employment with the Company, I am unable to obtain subsequent employment solely because of the provisions of Part IV C 1 and Part IV C 2 above, then, for each month of such unemployment and for a maximum of 24 consecutive months, the Company shall make payment to me equal to my average compensation paid or accrued for the two (2) calendar years previous to termination (exclusive of employee benefits), up to a maximum of Two Thousand Dollars ($2,000.00) per month.

B.    During each month of unemployment, and as a condition precedent to my claim for post-employment compensation, I agree:

    1.    to conscientiously seek employment, and

    2.    to prepare and submit to the Company a detailed written account of my efforts to obtain employment, and

    3.    to prepare and submit to the Company a written statement that I have not found employment and that the sole reason I was unable to obtain employment was due to the provisions of Part IV C 1 and Part IV C 2 above.

The Company shall be afforded a ten (10) day period from the receipt of my written account to investigate and confirm the validity thereof, and, upon such confirmation and the expiration of said period, the Company shall be obligated to make prompt payment of the monthly amount due under this Part V.

C.    Notwithstanding the foregoing, the Company, at its option, may be relieved of making post-employment compensation payments:

    1.    for any month during which I have not conscientiously sought employment, or

    2.    for any month during which I have failed to account as provided for above, or

    3.    by giving me written permission to accept available employment or a written release from the obligations of Part IV C above.

FEB-27-2005  09:52                                                                                    P.03

D.  Notwithstanding anything above to the contrary, Part V of this Agreement shall not apply if I am dismissed from employment by the Company for cause, i.e., for dishonesty, embezzlement, violation of government rules and regulations, persistent performance deficiency, or flagrant and repeated failure to follow company rules, regulations and policies. However, in the event I am dismissed for cause, I acknowledge that the remainder of this Agreement (except Part V) shall remain in full force and effect.

## VI.
### EXIT INTERVIEW

To assure a clear understanding of this Agreement, I agree to engage in an Exit Interview with the Company at a time and place designated by the Company. I understand and agree that following said Exit Interview I may be provided with an offer by the Company which, if I choose to accept its terms and abide by them, will limit the scope of the restrictions set forth in Parts IV C 1 and IV C 2 of this Agreement to a specified list of customers. Provided, however, in the event that I elect not abide by the list of specified customers offered to me by the Company, I understand and agree that the restrictions set forth in Parts IV C 1 and IV C 2 of this Agreement shall remain in full force and effect as written.

The Company, at its option, may elect to conduct the Exit Interview either at the Company's principal headquarters in Minneapolis, Minnesota, or through written correspondence, or by phone; provided, however, that the Company shall pay all reasonable travel and lodging expenses incurred by me in attending such Exit Interview if the Company requires my personal attendance.

## VII.
### INJUNCTIVE RELIEF

In the event of a breach or threatened breach of Part IV C 1 and/or IV C 2 above, the Company shall be entitled to a temporary and/or permanent injunction restraining such breach, and shall further be entitled to recover all attorney's fees reasonably incurred in establishing such violations of this Agreement; but nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available to it for such breach or threatened breach.

## VIII.
### SEPARATE AND DIVISIBLE COVENANTS

The covenants contained in this Agreement are intended to be separate and divisible covenants, and, if for any reason, any one or more thereof shall be held to be invalid or unenforceable, in whole or in part, it is agreed that the same shall not be held to affect the validity or enforceability of any other covenant or part of this Agreement. The terms and period set forth in Part IV C 1 and Part IV C 2 shall be reduced to the maximum permitted by the law actually applied to determine the validity of each such paragraph.

## IX.
### GOVERNING LAW

I agree that all of my obligations hereunder shall be binding upon my heirs, beneficiaries and legal representatives and that the law of the State of Minnesota shall govern as to the interpretation and enforceability of this Agreement.

Executed at Eden Prairie, Minnesota, this _____ day of _____, 200___.

WITNESS: _____          By  C. H. ROBINSON WORLDWIDE, INC.,

_____                    _____
Barbara Pepperak                                          President

Executed at _____10:00 am_____ this __28__ day of __FEBRUARY__ 200_5_

_____
Employee Signature                                          Revised by Legal June 2004

TOTAL  P.03

CASE NO. $\underline{\quad 08\ cv\ 576 \quad\quad\quad}$

ATTACHMENT NO.$\underline{\quad\quad\quad\quad\quad\quad}$

EXHIBIT $\underline{\quad E \quad\quad\quad\quad\quad\quad}$

TAB (DESCRIPTION) $\underline{\quad\quad\quad\quad\quad\quad}$

FEB-27-2005  09:51                                                      P.01

# C. H. ROBINSON WORLDWIDE, INC. AND SUBSIDIARIES
## EMPLOYEE AGREEMENT

JEFFREY R. SIEKMANN _____, hereinafter called "employee", "I", and  13167

"me".                                                                  (3)

**PRINT NAME**

### I.
### RECITALS

Employee wishes to be employed by C.H Robinson Worldwide, Inc., or one of its subsidiary or affiliated companies ("the Company") in a significant position involving customer or vendor contact, and access to the Company's confidential and proprietary business information. Employee wishes to enter into and continue such employment with the potential of increased responsibility and knowledge about the Company's affairs.

### II.
### DEFINITIONS

In this Agreement:

A.    The "Company" means CH Robinson Worldwide, Inc., and all existing or future affiliated corporations including all subsidiaries, divisions and enterprises owned or controlled by those corporations.

B.    "The Company Businesses" shall mean the fresh food or food ingredient sales business (similar to the Company's food distribution), or the freight contracting, contract logistics, freight forwarding, transportation logistics, transportation-related information systems businesses or custom house brokerage businesses, and other businesses the Company may become involved in now or in the future (collectively referred to as the "Company Businesses").

C.    "Confidential Information" shall mean,

    1.    All information, written (or generated/stored on magnetic, digital, photographic or other media) or oral, not generally known, or proprietary to the Company about the Company's designs, customers, suppliers, and the Company's marketing, accounting, merchandising, and information-gathering techniques and methods, and all accumulated data, listings, or similar recorded matter used or useful in the Company Businesses, which information includes but is not limited to the Company's customer and carrier lists, business forms, systems, practices, weekly loading lists, service contracts, pricing information, computer programs and marketing aids.

    2.    All information disclosed to me, or to which I have access during the period of my employment, for which there is any reasonable basis to be believed is, or which appears to be treated by the Company as, Confidential Information, shall be presumed to be Confidential Information hereunder.

D.    "Competing Business" means any business, firm, undertaking, company or organization, other than the Company, which:

    1.    is engaged in, or is about to become engaged in a business or businesses similar to the Company Businesses, or

    2.    regardless of the nature of its business, either competes directly or indirectly with the Company in any of the Company Businesses, or

    3.    any person, company or organization engaged in the produce or transportation industries as a shipper, receiver or carrier.

E.    "Customer" means any person, company or organization that has employed or potentially could employ the Company's services in any of the Company Businesses.

### III.
### NATURE OF EMPLOYEE'S ACTIVITIES

A.    I am aware and acknowledge that the Company has developed a special competence in the Company Businesses, and has accumulated as proprietary information (not generally known to others) more and better information about shippers, carriers, truckers, trucking equipment, railroads, ocean carriers, foreign agents, customers, purchasing agents and similar matters which are of unique value in the conduct and growth of the Company's Businesses. This proprietary pool of information has enabled the Company to conduct the Company Businesses with unusual success and has thus afforded unusual job opportunities and potential to its employees.

B.    In the course of my employment, I wish to be employed in a position or positions with the Company in which I may receive or contribute to Confidential Information. It is my desire to continue progressing in the Company in both sales, operations, management and customer-related capacities, and I recognize that optimum progression and specialization cannot take place unless Confidential Information relating to technology, processes, plans, development, activity, customers and the like is entrusted to me.

C.    The Company promises to provide me with Confidential Information to permit me to carry out, perform, and fulfill my job responsibilities. I acknowledge that the Company promises to provide me with such Confidential Information, and I further acknowledge in the course of carrying out, performing and fulfilling my responsibilities for the Company, I have been given Confidential Information relating to the Company's Businesses and customers, and I recognize that disclosure of any such Confidential Information to competitors of the Company or to the general public would be highly detrimental to the Company. I further acknowledge that, in the course of performing my obligations to the Company, I will be a representative of the Company to many of the Company's customers and, in some instances, practically the Company's sole and exclusive contact with the customer. In this capacity, I will be significantly responsible for maintaining or enhancing the business

relationship and/or goodwill of the Company with such customers.

**IV.**
**PROTECTION OF BUSINESS**

Therefore, in consideration of the Company's promise to provide me with Confidential Information, in consideration of my employment by the Company and in consideration of the compensation to be paid to me from time to time during such employment,

I hereby agree as follows:

A. Except as may be required in the performance of my employment duties with the Company, I will never at any time use, disclose, copy or assist any other person or firm in the use, disclosure or copying of any Confidential Information.

B. Upon the termination of my employment with the Company, all records or copies of such Confidential Information in my possession, whether prepared by me or others, and regardless of how the same came into my possession, will be turned over to the Company by me.

C. For a period of two (2) years after the termination of my employment with the Company, however occasioned and for whatever reason, I will not:

1. Directly or indirectly solicit, sell or render services to or for the benefit of any Competing Business, including a business which I may own in whole or in part, with any customer or prospective customer of the Company with whom I worked or had regular contact, or on whose account I worked, at any time during the last two years of my employment with the Company; or

2. Recruit, hire or solicit any employee of the Company for employment with or on behalf of any Competing Business or attempt to interfere with the employment contracts or contract relationships between the Company and its employees, or directly or indirectly cause or attempt to cause any employee of the Company to terminate employment with the Company.

3. Cause or attempt to cause any customer of the Company to divert, terminate, limit or in any manner modify or fail to enter into any actual or potential business relationship with the Company.

4. It is understood by me and agreed to by the Company that upon the termination of my employment hereunder, I will not be restricted territorially from competing with the Company so long as I comply with the provisions of Part IV herein.

5. It is further understood and agreed that the running of the two (2) year period of restriction set forth in Part IV C shall be tolled during any time period in which I violate the provisions of Part IV C.

D. I will devote my entire time, attention and energies to the business of the Company and shall not, during the period of my employment, be engaged in any other business activity whether or not such business is pursued for gain, profit or other pecuniary advantage. This restriction, however, shall not be construed as preventing me from investing my assets in such form or manner as will not require any services on my part in the day-to-day operation of the affairs of the companies in which such investments are made.

**V.**
**POST-EMPLOYMENT COMPENSATION**

A. Except as provided in paragraphs C and D of this Part V, if, following the termination of my employment with the Company, I am unable to obtain subsequent employment solely because of the provisions of Part IV C 1 and Part IV C 2 above, then, for each month of such unemployment and for a maximum of 24 consecutive months, the Company shall make payment to me equal to my average compensation paid or accrued for the two (2) calendar years previous to termination (exclusive of employee benefits), up to a maximum of Two Thousand Dollars ($2,000.00) per month.

B. During each month of unemployment, and as a condition precedent to my claim for post-employment compensation, I agree:

1. to conscientiously seek employment, and

2. to prepare and submit to the Company a detailed written account of my efforts to obtain employment, and

3. to prepare and submit to the Company a written statement that I have not found employment and that the sole reason I was unable to obtain employment was due to the provisions of Part IV C 1 and Part IV C 2 above.

The Company shall be afforded a ten (10) day period from the receipt of my written account to investigate and confirm the validity thereof, and, upon such confirmation and the expiration of said period, the Company shall be obligated to make prompt payment of the monthly amount due under this Part V.

C. Notwithstanding the foregoing, the Company, at its option, may be relieved of making post-employment compensation payments:

1. for any month during which I have not conscientiously sought employment, or

2. for any month during which I have failed to account as provided for above, or

3. by giving me written permission to accept available employment or a written release from the obligations of Part IV C above.

FEB-27-2005  09:52                                                              P.03

D.    Notwithstanding anything above to the contrary, Part V of this Agreement shall not apply if I am dismissed from employment by the Company for cause, i.e., for dishonesty, embezzlement, violation of government rules and regulations, persistent performance deficiency, or flagrant and repeated failure to follow company rules, regulations and policies. However, in the event I am dismissed for cause, I acknowledge that the remainder of this Agreement (except Part V) shall remain in full force and effect.

## VI.
## EXIT INTERVIEW

To assure a clear understanding of this Agreement, I agree to engage in an Exit Interview with the Company at a time and place designated by the Company. I understand and agree that following said Exit Interview I may be provided with an offer by the Company which, if I choose to accept its terms and abide by them, will limit the scope of the restrictions set forth in Parts IV C 1 and IV C 2 of this Agreement to a specified list of customers. Provided, however, in the event that I elect not abide by the list of specified customers offered to me by the Company, I understand and agree that the restrictions set forth in Parts IV C 1 and IV C 2 of this Agreement shall remain in full force and effect as written.

The Company, at its option, may elect to conduct the Exit Interview either at the Company's principal headquarters in Minneapolis, Minnesota, or through written correspondence, or by phone; provided, however, that the Company shall pay all reasonable travel and lodging expenses incurred by me in attending such Exit Interview if the Company requires my personal attendance.

## VII.
## INJUNCTIVE RELIEF

In the event of a breach or threatened breach of Part IV C 1 and/or IV C 2 above, the  Company shall be entitled to a temporary and/or permanent injunction restraining such breach, and shall further be entitled to recover all attorney's fees reasonably incurred in establishing such violations of this Agreement; but nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available to it for such breach or threatened breach.

## VIII.
## SEPARATE AND DIVISIBLE COVENANTS

The covenants contained in this Agreement are intended to be separate and divisible covenants, and, if for any reason, any one or more thereof shall be held to be invalid or unenforceable, in whole or in part, it is agreed that the same shall not be held to affect the validity or enforceability of any other covenant or part of this Agreement. The terms and period set forth in Part IV C 1 and Part IV C 2 shall be reduced to the maximum permitted by the law actually applied to determine the validity of each such paragraph.

## IX.
## GOVERNING LAW

I agree that all of my obligations hereunder shall be binding upon my heirs, beneficiaries and legal representatives and that the law of the State of Minnesota shall govern as to the interpretation and enforceability of this Agreement.

Executed at Eden Prairie, Minnesota, this _____ day of _____, 200___.

WITNESS:                                     By  C. H. ROBINSON WORLDWIDE, INC.

Barbara Peppersack

                                             President

Executed at _____ 10:00 AM _____ this 28 day of FEBRUARY 200 5

Employee Signature

Revised by Legal June 2004

TOTAL  P.03

CASE NO. _08cv576_____

ATTACHMENT NO._____

EXHIBIT _F_____

TAB (DESCRIPTION) _____

**From:** ForwardResume@Site.Careerbuilder.com [mailto: ...
**Sent:** Monday, January 21, 2008 8:36 AM
**To:** Carmen Baas; Kira Meinzer
**Subject:** CareerBuilder: Take a look at this candidate...

# careerbuilder.com

**LOOK AT THIS RESUME**

To:  kira.meinzer@chrobinson.com;
     carmen.baas@chrobinson.com;

Forwarded
By:  KARLA.SCHMIDT@CHROBINSON.COM

**I thought you might be interested in this resume...**

Retention scan. Thanks!

## Personal Profile

| | | | |
|---|---|---|---|
| **Name:** | Jeffrey Siekmann | **Email:** | jsiek@cox.net |
| **Phone:** | 623-388-3563 | **Location:** | US-AZ-Phoenix-85024 (Not Specified) |

## Experience

| | | | |
|---|---|---|---|
| **Total years experience:** | 22 Years | **Job Categories:** | Transportation (22 Years experience) |

## Work History

| | | |
|---|---|---|
| **Job Title:** | National Account Manager | (8 Years) January, 2000 - Present |
| **Company Name:** | C.H. Robinson Worldwide, Inc. | |

| | | |
|---|---|---|
| **Job Title:** | Customer Sales | (4 Years) June, 1996 - January, 2000 |
| **Company Name:** | American Backhaulers, Inc. | |

| | | |
|---|---|---|
| **Job Title:** | Operations Manager | (3 Years) August, 1993 - June, 1996 |
| **Company Name:** | DAV Transportation Services, Inc. | |

## Education

| | | | | | |
|---|---|---|---|---|---|
| **School:** | Illinois State University | **Major:** | Economics | **Degree:** | Bachelor's Degree |

## Additional Skills And Qualifications

| | | | |
|---|---|---|---|
| **Recent Job Title:** | National Account Manager | **Recent Wage:** | 130,000 USD per year |
| **Managed Others:** | Yes (15 others) | **Languages Spoken:** | English |
| **Security Clearance:** | No | | |
| **Felony Conviction:** | No | | |

## Desired Position

| | | | |
|---|---|---|---|
| **Desired Wage:** | 80,000 USD per year | **Desired Employment Type:** | Full Time |
| **Desired Travel:** | Negligible | **Desired Commute:** | 25 miles |
| **Desired Relocation:** | | | |

## Resume

If you have questions or comments for CareerBuilder, please use our feedback form: Feedback.

This email was sent from Account ID AQ3JZ6RDWXMXM28TT4 and by this logged in User UO2H66802ZTMGH20RF

*********************************************************************************************
This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from

1/21/2008

your system. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of CH Robinson. CH Robinson accepts no liability for any damage caused by any virus transmitted by this email. CH Robinson Worldwide, 14701 Charlson Road, Eden Prairie, MN, USA
*****************************************************************************************************